IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:08-CR-210-WKW [WO] |
| | ) | |
| NARENDRAKUMAR P. PATEL | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Narendrakumar P. Patel is charged with one count of possessing a firearm as an alien illegally and unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5)(A).  (Indictment (Doc. # 1).)  He filed a motion to suppress physical evidence the Government seized during a search of his business and subsequent statements he made to Government agents.  (Suppression Mot. (Doc. # 25).)  He also moved to dismiss the Indictment on the ground that § 922(g)(5)(A) violates the Second Amendment to the United States Constitution. (Dismissal Mot. (Doc. # 26).)  The Government responded in opposition to both.  (Dismissal Resp. (Doc. # 28); Suppression Resp. (Doc. # 35); Supplemental Suppression Resp. (Doc. # 37).)  On February 6, 2009, the Magistrate Judge held an evidentiary hearing on the motion to suppress (Doc. # 39), and ordered supplemental briefing on whether certain documents seized during the search were subject to the attorney-client privilege.  (Evidentiary Hr'g Tr. 72, Feb. 6, 2000 (Doc. # 48).)  Mr. Patel and the Government filed their respective briefs.  (Def.'s Attorney-Client Br. (Doc. # 45); Gov't's Attorney-Client Br. (Doc. # 49).)

The Magistrate Judge entered separate recommendations on the motions.  The first recommends denying the motion to suppress as to the physical evidence but granting it as to Mr. Patel's statements. (Doc. # 52.) The second recommends denying the motion to dismiss. (Doc. # 53.)  Mr. Patel filed no objections.  The Government filed an Objection to the Suppression Recommendation to the extent it did not explicitly rule on Mr. Patel's statements to an ICE agent and could be read to recommend suppressing those statements.  (Doc. # 60) The portions of a recommendation to which a party objects must be reviewed *de novo*.  28 U.S.C. § 636(b)(1).  If no objections are filed, this court "may undertake 'further review . . . , *sua sponte* or at the request of a party, under a *de novo* or any other standard.'"  *Stephens v. Tolbert*, 471 F.3d 1173, 1176 (11th Cir. 2006) (quoting *Thomas v. Arn*, 474 U.S. 140, 154 (1985)).  Even though Mr. Patel did not object to the recommendation, the portions to which the Government did not object have been independently reviewed.[1]

A careful review of the record, arguments by counsel, and case law supports adopting both Recommendations, except to the extent the Magistrate Judge recommends suppressing statements Mr. Patel made to the ICE agent.  On that point, the Suppression Recommendation is due to be rejected.  As to the other rulings, the Recommendations are due to be adopted with explanatory reasoning on selected points.

---

[1] The Magistrate Judge entered his recommendations on April 1, 2009, and the Government objected later that month.  The progress of this case has been delayed because of pending federal proceedings on Mr. Patel's immigration status, proceedings he claims directly impact this matter (*see, e.g.*, Doc. # 72 ¶ 3).  (*See* Docs. # 67, 71, 72, 83.)

2

A.      **Summary of the Suppression Issues**

Mr. Patel moved to suppress the firearm and black binder of documents seized during the search of his convenience store, and the three statements he made after the search – to an ICE agent, an FBI agent, and a Secret Service agent respectively.  Mr. Patel argues the following.  The firearm should be suppressed as the fruit of an unlawful search,[2] or because its seizure was not otherwise supported by probable cause.[3]  The black binder documents should be suppressed because they are subject to the attorney-client privilege.[4]  And Mr. Patel's statements to federal agents should be suppressed as fruit of the unlawful search or because they were made during custodial interrogation without *Miranda* warnings, and thus, in violation of the Fifth Amendment to the United States Constitution.

---

[2] Mr. Patel also argues that the search warrant violated the particularity requirement (Suppression Mot. ¶¶ 9-10), but the Government has conceded it is not relying on Attachment I of the warrant as justification for seizing the firearm (Suppression Resp. 5 n.3).

[3] In fairness, it should be acknowledged that Mr. Patel did not concede that there was probable cause to seize the weapon. (*Cf.* Suppression Recommendation 10.)  At the evidentiary hearing, Mr. Patel's counsel conceded only that the weapon could be *secured* without probable cause, as an instrumentality of crime, but not that the weapon could be *seized* without probable cause (*see* Hr'g Tr. 74).  *See United States v. Malachesen*, 597 F.2d 1232, 1234-35 (8th Cir. 1979) ("Although the incriminating nature of the handgun may not have been immediately apparent to the investigating officers, its temporary seizure, unloading, and retention by a responsible officer . . . seems a reasonable precaution to assure the safety of all persons on the premises during the search. . . . When the officers learned that [the defendant] had a prior conviction, the temporarily-seized handgun became contraband and subject to seizure as an illegal weapon possessed by a felon.").  Indeed, throughout the hearing, counsel continued to challenge the basis for seizing the firearm under the plain view doctrine (*see* Hr'g Tr. 74-77).

[4] "'Where there is an intrusion on the attorney-client relationship the remedy for such a violation is not dismissal but the suppression of any evidence so obtained.'" *United States v. Melvin*, 650 F.2d 641, 644 (5th Cir. Unit B July 1981) (quoting *United States v. Sander*, 615 F.2d 215, 219 (5th Cir. 1980)).

The Magistrate Judge recommends denying suppression of the firearm for two reasons. First, seizing the firearm was not the fruit of an unlawful search of the premises – probable cause supported the search warrant. (Suppression Recommendation 10.) Second, the black-binder documents were not privileged, so the firearm should not be suppressed because it was seized on account of their discovery. (Suppression Recommendation 10.) The same reason justifies not suppressing the binder. (*See* Suppression Recommendation 10-14; Def.'s Attorney-Client Brief 6.)[5]

The Magistrate Judge recommends, however, granting suppression of Patel's statements to federal agents after the search. (Suppression Recommendation 15.) The Government has conceded that the statement to the FBI Agent should be suppressed, and stated that it would not use the statements to the Secret Service agent on the ground of relevance. (Hr'g Tr. 73; Suppression Resp. 14-15.) As for the statement to the ICE agent, however, the Suppression Recommendation does not specifically address whether it were taken in violation of *Miranda*. The Government argues that *Miranda* was not violated and that the ICE statement should come in because Mr. Patel was not in custody at the time of questioning. (Suppression Resp. 14.) Upon a *de novo* review, the court agrees with the Government.

---

[5] The Government's arguments are slightly different. (*See* Suppression Resp. 10-12.) Because the Government prevails on the basis of Mr. Patel's status, the arguments as to *Ms.* Patel's status need not be address. The Government's separate supplemental arguments (*see* Supplemental Suppression Resp.) also will not be addressed.

B.    **Suppression of the Weapon**[6]

The Magistrate Judge correctly concluded that the Government lawfully seized the firearm.  This discussion serves to amplify that conclusion.  As the court understands the evidence in this case, the firearm was secured first, then seized after the black binder documents were discovered in the search and reviewed.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  During a legal search, however, the "temporary seizure, unloading, and retention" of a firearm by a "responsible officer," is a "reasonable precaution to assure the safety of all persons on the premises of the search," and, alone, justifies securing the weapon without a warrant.  *United States v. Malachesen*, 597 F.2d 1232, 1234 (8th Cir. 1979); *see also United States v. Bishop*, 338 F.3d 623, 626 (6th Cir. 2003) (affirming a temporary seizure on these grounds);[7] *United States v. Legg*, 18 F.3d 240, 244 (4th Cir. 1994) (same) (noting that "[i]t is a hallmark of Fourth Amendment jurisprudence that the possibility of a threat to the safety of law enforcement officers may constitute exigent circumstances

_____

[6] The Suppression Recommendation narrates the facts, which are hereby adopted.  (*See* Suppression Recommendation 1-6.)  To the extent that additional facts matter, they will be highlighted as they fit into the legal analysis.  Record citations are given for particularly salient facts.

[7] *Bishop*, 338 F.3d at 626 ("The Supreme Court also has indicated that the plain view exception permits the warrantless seizure of 'objects dangerous in themselves.'" (quoting *Coolidge v. New Hampshire*, 403 U.S. 443 (1971) (plurality op.)) (also citing *Malachesen*, 597 F.2d at 1234 n.4).  In *Bishop*, the court described prior opinions of that court that justified the temporary seizure of a firearm as an application of *Terry v. Ohio*, 392 U.S. 1 (1968).  *Id.* (noting cases that had "approved of police seizure of a weapon that was not obvious contraband based on an officer's reasonable belief that the weapon posed a threat to officer safety").

justifying a warrantless search or seizure"); *United States v. Arcobasso*, 882 F.2d 1304, 1307 (8th Cir. 1989) (reiterating *Malachesen*); *United States v. Timpani*, 665 F.2d 1, 5 n.8 (1st Cir. 1981) (justifying a seizure of weapons during a search when it "might well have been dangerous to leave the weapons" where they were).  "[T]he warrantless seizure of a gun is 'objectively reasonable' under the Fourth Amendment when there is a real concern for the safety of the officers present or the public at large."  *United States v. Newsome*, 475 F.3d 1221, 1226 (11th Cir. 2007) (interpreting *New York v. Quarles*, 467 U.S. 649, 653 n.3 (1984)).  Mr. Patel's counsel conceded at the evidentiary hearing that "if the search is valid, it certainly is permissible for police officers conducting a search to *secure* a weapon that they find even if they don't have any reason to believe that the weapon is evidence."  (Hr'g Tr. 74.)

At issue for this ruling, therefore, is whether the *seizure* of the gun after that initial detention was lawful.  Once officers during a search determine that a temporarily seized firearm is contraband, they can then seize it.  *Malachesen*, 597 F.2d at 1235.[8]  It can be seized under the plain view doctrine.[9]  *See Texas v. Brown*, 460 U.S. 730, 738 (1983)

---

[8]  *Malachesen* does not articulate a justification for this conclusion.

[9]  Arguably, the evidence also could have been seized under the exigency exception to the warrant requirement which allows for officers to seize evidence "where there is a fear that it might disappear or be destroyed," *Newsome*, 475 F.3d at 1226 (holding that officers legally seized a gun during a lawful search because "[i]t was not unreasonable for the officers to fear leaving a loaded gun, likely evidence of a crime . . . , unattended in a motel room" and that it was not unlikely that a particular person  "would return to the room and remove the gun," *id.* at 1226-27).  *See also Illinois v. McArthur*, 531 U.S. 326, 337 (2001) ("[T]he police officers in this case had probable cause to believe that a home contained contraband, which was evidence of a crime. They reasonably believed that the home's resident, if left free of any restraint, would destroy that evidence.").  To seize evidence under this exigency rule, as with

(plurality op. of Rehnquist, J.) ("'[P]lain view' provides grounds for seizure of an item when an officer's access to the object has some prior justification under the Fourth Amendment."); *id.* at 739 ("'Plain view' is perhaps better understood . . . not as an independent 'exception' to the warrant clause, but simply an extension of whatever the prior justification for the officer's 'access to an object' may be."); *Arizona v. Hicks*, 480 U.S. 321, 327 (1987) (describing the theory of the "plain view" doctrine as extending to nonpublic places "the police's longstanding authority to make warrantless seizures in public places of such objects as weapons and contraband"). A warrantless seizure is reasonable under the "plain view" doctrine – "where (1) an officer is lawfully in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). "'An example of the applicability of the plain view doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character.'" *Id.* (quoting *Horton*, 496 U.S. at 135).

---

the plain view doctrine, there must be probable cause that what is being seized is contraband. *See United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (*en banc*); *See v. City of Seattle*, 387 U.S. 541, 546 (1967) (applying the warrant requirement for residences to parts of the business not open to the public); *see also United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996) (describing probable cause as whether under the "totality of the circumstances," there is a fair probability of contraband or evidence of a crime). For the same reasons stated herein that the firearm was incriminating on its face, it was also evidence of the crime. It was reasonable to believe it would have disappeared had it not been seized.

For the plain view doctrine to apply, the officers "must have probable cause to believe that the object in plain view is contraband." *Smith*, 459 F.3d at 1290. It must be "immediately apparent" that the item is or has been the evidence of criminality. *Id.* If probable cause cannot be established "without conducting some further search of the object," then it cannot be seized in plain view. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (citing *Hicks*, 480 U.S. 321). "'In dealing with probable cause . . . [the courts] deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . . . 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.'" *Smith*, 459 F.3d at 1291 (omissions in original) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). For probable cause to be established, it is not necessary for the officers to know "'with absolute certainty'" that all elements of the crime have been met where an object "'reasonably appears to be incriminating evidence.'" *Id.* at 1292 (quoting *United States v. Slocum*, 708 F.3d 587, 601 (11th Cir. 1983)). Weight should be given to the inferences law enforcement officers draw from the facts. *Id.* at 1291.

8

Here, the officers were executing a valid warrant on Mr. Patel's premises when one of them found the firearm.[10]  The agent found the weapon on a shelf above eye-level behind the cash register where he was searching spaces that could contain documents listed in the warrant. (Hr'g Tr. 13.)  There is no dispute, therefore, that the agent who found the weapon was in a lawful place and had lawful right of access to it.  He testified that he immediately knew it was a firearm because of how it felt and because of the way the firearm was on the holster. (Hr'g Tr. 13.)  He secured the weapon by removing it from the shelf and unloading it.  At one point, it was left on a counter. (Hr'g Tr. 13, 26.)  The agent testified that Ms. Patel, in response to his question, stated that the gun belonged to her husband.  (Hr'g Tr. 14.)  Eventually, the officers seized the firearm – they took it away from the Patels' possession on the basis that it was contraband.

Mr. Patel challenges the basis for that seizure, namely whether the officers' belief that Mr. Patel was prohibited from having the firearm was reasonable.  The belief was reasonable ostensibly because of what the officers saw in a black binder they found during the search.  Mr. Patel avers, however, that the officers were not entitled to rely on those documents because they were privileged.

The party invoking the attorney-client privilege has the burden of proving both the attorney-client relationship and the confidentiality of particular communications.  *Bogle v.*

---

[10] The Magistrate Judge correctly found that the justification for searching the premises was valid.  Thus, neither the firearm nor the binder should be suppressed as fruits of an illegal search on that ground.

*McClure*, 332 F.3d 1347, 1358 (11th Cir. 2003).  Documents which "by their very nature contemplate disclosure to third parties . . . are not within the scope of the attorney-client privilege," as they are not confidential.  *United States v. Aronson*, 781 F.2d 1580, 1581 (11th Cir. 1986) (*per curiam*).  In addition, "courts have refused to apply the privilege to information that the client intends his attorney to impart to others."  *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976).[11]

The black binder contained various documents from Mr. Patel's immigration lawyer: invoices detailing the amount of fees for services, receipts demonstrating payment of invoices, letters from counsel informing Mr. Patel of filings made on his behalf, and the copies of those filings.  (Binder Docs. (Doc. # 46 Att.).)  The copies of the immigration-related applications and petitions filed on behalf of Mr. Patel are not confidential communications.  Mr. Patel clearly intended for his attorney to impart the information in those documents to others and contemplated disclosure to third parties; indeed, they most likely *were* disclosed to third parties.[12]  Because these documents were not confidential and therefore not privileged, and because the agent reviewing the binder testified to seeing them (Hr'g Tr. 39), the agents were not barred from relying on them to seize the firearm.

---

[11] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit prior to October 1, 1981.

[12] The copies of the petitions in the binder appear to be final copies of the petitions, not drafts containing any confidential communication.

10

The Government argues that those documents gave rise to a reasonable belief that the firearm was contraband.  An agent who was at the search testified that, after reviewing the binder's documents while on the premises, he concluded that the legality of Mr. Patel's immigration status was in question.  (Hr'g Tr. 27-29.)  An example of a non-privileged document that could have formed the basis of that belief is Bates Number 116.[13]  This document, an official one from the Government, states: "The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status."  The binder also contains copies of Mr. Patel's passport and employment authorization card.  (Binder Docs. Bates No. 127-29.)  There is a July 2007 letter from Dasharath Patel to the United States Department of Homeland Security titled "Re: Adjustment of Status of [Mr. Patel]" in support of Mr. Patel's immigration visa petition (Bates No. 128), and there is a 2004 final determination letter from the United States Department of Labor certifying an application for employment[14] (Bates No. 148).  The Tenth Circuit has held that a defendant is "illegally or unlawfully in the United States" for purposes of § 922(g)(5)(A) even if he has filed an application for an adjustment and is in receipt of an employment authorization document.  *United States v. Ochoa-*

---

[13] One of the agents testified to reviewing a letter in the binder from a law firm (Hr'g Tr. 30), but it is unclear what the letter conveyed or if it had any attachments.  Another agent testified to looking through the binder, "perusing" the documents. (Tr. 39.)

[14] There does not appear to be an application more recently approved.

*Colchado*, 521 F.3d 1292, 1298 (10th Cir. 2008).  Those documents are sufficient to justify a reasonable belief that Mr. Patel's status was not legal.[15]

This information gleaned from the documents made the weapon's criminality immediately apparent.  In *United States v. Wells*, 98 F.3d 808 (4th Cir. 1996), the court held that a seizure of a weapon in plain view during a legal search was lawful because evidence from a prior review of the defendant's criminal records indicated that he had a previous felony conviction.[16]  *Id.* at 810.  And the First Circuit, in *United States v. Mousli*, 511 F.3d 7, 13 (1st Cir. 2007), recently reached the same conclusion on whether law enforcement had the authority to take firearms during a lawful search for a § 922(g)(5)(A) violation.  The court found the seizure lawful because the officers had probable cause, based on their prior review of records, that the defendant was an alien with a prior conviction, and thus, was not licensed to have a firearm under state law.  *Id.* at 13-14.  Similarly, the firearm's criminality was immediately apparent once the officers had probable cause to believe that Mr. Patel was a prohibited person.

Thus, in light of the experience of some of the agents, the review of the documents, combined with Ms. Patel's non-committal and evasive answers to immigration-related

---

[15] The officers' belief that the gun belonged to Mr. Patel was also reasonable.  The gun was found in Mr. Patel's store above the cash register and Ms. Patel stated it belonged to her husband.

[16] The court also held, however, that "[b]ecause mere possession of a firearm is a presumptively legal activity, *knowledge* of [the defendant's] status as a felon was necessary to make the incriminating nature of the firearm immediately apparent in these circumstances." *Wells*, 98 F.3d at 810 n.* (emphasis added).  But the court does not read *Wells* to require *certainty* of offense elements to justify seizing an item based on probable cause that it was contraband.

questions,[17] the officers were justified in seizing the firearm based on a reasonable belief that

Mr. Patel's immigration status was not legal and that the weapon was therefore contraband.[18]

Because probable cause justified seizing the firearm under the "plain view" doctrine,

it should not be suppressed. On this conclusion, the Suppression Recommendation is due to

be adopted.

## C.     **Suppression of the Binder Content**

The Magistrate Judge also recommends against suppressing the binder documents

because they fall outside the attorney-client privilege. (Suppression Recommendation 12-

14.) Mr. Patel claims the entire notebook is attorney-client correspondence that should be

suppressed. He argues that the first page of the notebook was an invoice or bill from his

attorney listing items and providing descriptions that were related to legal work, and that for

that reason the officers should have known the binder was protected. (Def.'s Attorney-Client

Br. ¶¶ 3, 8.) His argument does not raise specific challenges to each document's disclosure,

---

[17] Although probable cause is based on Mr. Patel's status, that Ms. Patel did not provide straight-forward answers to the immigration-related questions (*see* Hr'g Tr. 24-25) factors into the context-dependent probable cause determination of *his* status.

[18] There is no one agent who was privy to all of the circumstances justifying probable cause – review of the documents, viewing the firearm in light of the documents, awareness of the law, and knowledge of Ms. Patel's answers. Nevertheless, the "collective knowledge" doctrine saves the probable cause determination. In situations such as these, "when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause." *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1990); *see also, e.g., Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997) (noting that probable cause can exist based on the "collective knowledge of the law enforcement officials" (internal quotation marks and citation omitted)); *Wells*, 98 F.3d at 810 ("[A]lthough the agent who actually seized the weapon pursuant to the supervising agent's instructions had no personal knowledge that Wells was a convicted felon, it is sufficient that the agents collectively had probable cause to believe the weapon was evidence of a crime at the time of the seizure.").

but it will be interpreted to argue that each document contains attorney-client correspondence.[19]

The Magistrate Judge recommends finding that the invoices and billing statements can be disclosed (Suppression Recommendation 12-13), and that the publicly filed documents, like the petitions and applications, are inherently not confidential and thus not to be suppressed (Suppression Recommendation 13-14).  The Suppression Recommendation denies the motion for the rest of the documents because Mr. Patel did not argue why certain specific documents should otherwise be privileged.  (Suppression Recommendation 14.)

Based upon an independent review of the record and case law, the Suppression Recommendation is due to be adopted on this issue, because the documents are not privileged.  One additional point on the invoices supplements the recommendation.  The general rule is that the attorney-client privilege does not protect against the disclosure of attorney's fees.  *In re Grand Jury Proceedings 88-9 (MIA)*, 899 F.2d 1039, 1044 (11th Cir. 1990).  There is an exception, however, known as the "last link" doctrine for instances where "'more than simple fee information will necessarily come to light . . . thereby uncovering privileged information.'"  *Id.* (quoting *In re Grand Jury Subpoena of Slaughter*, 694 F.2d 1258, 1260 (11th Cir. 1982)).[20]  Where billing statements contain descriptions of legal

---

[19] The Government argues that: (1) the invoices are not protected by the privilege; (2) Mr. Patel cannot assert a privilege with respect to documents between his attorney and other entities; (3) Mr. Patel's petitions contain information from third parties, which shows that he related a fact within the presence of strangers; and (4) Mr. Patel has waived his privilege with respect to documents filed on his behalf with federal agencies.  (Gov't's Attorney-Client Br. 4-8.)

[20] (*See* Suppression Recommendation 13 n.8.)

14

services that reveal confidential communications, courts have found the privilege protects those portions of the bills. *See, e.g.*, *In re Grand Jury Proceedings Subpoena to Testify to: Wine*, 841 F.2d 230, 231, 233 (8th Cir. 1988) (agreeing with the district court granting a motion to quash portions of billing statements containing descriptions of legal services that revealed confidential communications).

Thus, when documents listing attorney's fees contain additional information, "[t]he district court must determine whether that other information is normally protected by the attorney-client privilege." *In re Grand Jury Proceedings*, 896 F.2d 1267, 1275 (11th Cir.), *rehr'g granted and vacated*, 904 F.2d 1498 (11th Cir. 1990) (but reasoning still relied upon in part on this point); *see also, e.g.*, *United States v. Leventhal*, 961 F.2d 938, 940 (11th Cir. 1992) (*per curiam*). For example, if billing statements contain information revealing a research strategy, or potential witness, that information may be privileged. *See In Re Grant Jury Proceeding*, 896 F.2d at 1275. An invoice revealing that an attorney was hired to defend or help a client where the motive for retaining the lawyer was already known, on the other hand, is not confidential and would not be privileged. *Id.* at 1275 n.5.

The invoices in Mr. Patel's binder describing the services his attorney rendered do not reveal confidential communications and therefore, are not privileged.[21] The legal services invoices and statements were for filing petitions and applications and related ancillary charges, like shipping. (*See* Bates Nos. 104, 106, 108, 111, 112, 114, 117, 119, 120, 121,

---

[21] (*See also* Suppression Recommendation13 ("A review of the invoices shows they do not reveal any confidential information . . . .").)

123-25, 184.)  And as already explained, filings of petitions and applications are public, so those documents are not privileged.  There is no confidential communication exposed by highlighting the attorney's work on those matters.

Mr. Patel has not asserted the privilege specifically with respect to any other portions of the attorney's correspondence.  To the extent that correspondence does not cover information related to applications and petitions, Mr. Patel may assert the privilege again in a motion in limine.  On the issue of suppressing the binder documents, the Suppression Recommendation is due to be adopted.[22]

**D.**     **Motion to Suppress Statements to the ICE Agent**

After the agents searched his business, Mr. Patel rode with some of them to the immigration office in Montgomery, where ICE Agent Blake Diamond ("Agent Diamond") interviewed him.  Mr. Patel seeks to suppress his statements from that interview because, he argues, he gave them without first receiving *Miranda* warnings.  The Government challenges the Suppression Recommendation to the extent it can be interpreted to grant the motion on this point.  This portion of the Suppression Recommendation therefore will be reviewed *de novo*.

The privilege against self-incrimination guaranteed by the Fifth Amendment protects an individual who refuses to answer official questions put to him in any proceeding where the answers might incriminate him in future criminal proceedings.  *United States v. Lopez-*

---

[22] Because the documents were not privileged, Mr. Patel's statements were not tainted as fruit of an illegal seizure on that ground.

*Garcia*, 565 F.3d 1306, 1316 (11th Cir. 2009).  "In *Miranda v. Arizona*, 384 U.S. 436, 444

(1966) [ ], the Supreme Court held that protecting a suspect's Fifth Amendment privilege

against self-incrimination requires that he be warned prior to 'custodial interrogation' that

he has the right to remain silent and to have an attorney present."  *Id.*  Mr. Patel was not

given *Miranda* warnings prior to the interview with Agent Diamond.  Those warnings were

required if the interview was a custodial interrogation.

       The Government concedes that the interview was an interrogation.[23]  (Suppression

Resp. 14.)  The issue is whether the interrogation was custodial.  A person is in custody for

Fifth Amendment purposes if a reasonable person "would have felt free to terminate the

interview and leave."  *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004); *see also United*

*States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) ("Whether [the defendant] was in

custody prior to his formal arrest 'depends on whether under the totality of the circumstances,

---

       [23] The Eleventh Circuit issued its opinion in *Lopez-Garcia* after the Government conceded this
point.  In *Lopez-Garcia*, the court held that the ICE agent's questioning of a defendant for the purpose of
determining his immigration status was not an interrogation under the Fifth Amendment.  565 F.3d at
1316-17.  This case is, however, arguably distinguishable.  For one, Agent Diamond testified that the
agents executing Mr. Patel's search contacted him and informed him of the search.  (Hr'g Tr. 46.)
Although he claims he was unaware of the firearm found on the premises (Hr'g Tr. 60), Agent Diamond
was aware that the other agents had grounds for suspecting Mr. Patel's immigration status.  Agent
Diamond received a phone call from an agent at the search about bringing Mr. Patel by the immigration
office to identify him since the agents had discovered documents that led them to believe he was not a
United States citizen (Hr'g Tr. 45-46, 57).  In *Lopez-Garcia*, however, the ICE agent "should not have
thought it especially likely that [the defendant] would admit to having committed a crime," given the
information available at the time of the interview.  565 F.3d at 1317.
       Also, Agent Diamond's questions directly followed a search of Mr. Patel's premises.  The ICE
agent in *Lopez-Garcia*, on the other hand, had no reason to believe the defendant would be prosecuted.
565 F.3d at 1317; *see also United States v. Mata-Abundiz*, 717 F.2d 1277, 1279 (9th Cir. 1983) (stating
that "interrogation" depends on "[i]f the [Immigration Naturalization Service] investigator has no reason
to suspect that the question asked is likely to elicit an incriminating response").  In any event, the
Government conceded the interrogation point.

a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.'").

Mr. Patel was not under arrest when he was brought to Agent Diamond's office. One of the agents who searched Mr. Patel's premises testified that on advice from Agent Diamond, whom he had contacted after the documents were found, he asked Mr. Patel to come with him to the immigration office. (Hr'g Tr. 46, 51.) At that time, that agent was wearing a windbreaker visibly marked "Secret Service." (Hr'g Tr. 46-47.) Mr. Patel said "yes," that he would do anything that he could to help (Hr'g Tr. 51), and he rode with two agents to the immigration office (Hr'g Tr. 48) in a Ford Explorer outfitted with police lights (Hr'g Tr. 53). None of the agents testified, however, to telling Mr. Patel he was not arrested, and the agent who brought Mr. Patel testified that he never told Mr. Patel that he could refuse to go (Hr'g Tr. 52), or that he was free to leave (Hr'g Tr. 54). Mr. Patel also testified that no one told him that he did not have to go, and that he did not know he had a right to refuse. (Hr'g Tr. 66.) He claims he went to the immigration office because he was "scared." (Hr'g Tr. 67.) Mr. Patel spoke with Agent Diamond for ten to fifteen minutes at a work station in the office. Agent Diamond asked him for his papers and fingerprints, and at some point during the conversation, Agent Diamond testified, Mr. Patel said that he had applied to adjust his immigration status, which Agent Diamond verified, concluding that Mr. Patel had followed through on the second application. (Hr'g Tr. 56-62.)

18

There are a few features about Agent Diamond's interview that undermine the Government's position. For one, Mr. Patel was not told he was free to leave. That weakens the Government's case. *See Brown*, 441 F.3d at 1347 ( "Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the [custody analysis], and generally leads to the conclusion that the defendant is *not* in custody . . . ."); *id.* at 1348 (adding that if a defendant said he "understood the officers' advice that he was not under arrest and was free to leave," that would "strengthen[] the force of the instructions"). Also, the interview took place in a law enforcement office and after Mr. Patel had witnessed several law enforcement agents scour his business. *See id.* (describing courts as "'much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the suspect's home" (quoting *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994)).

Several other aspects of the interrogation, however, point against finding a custodial interrogation. The agent who asked Mr. Patel to come to the station and transported him was armed but his weapon was not displayed.[24] (Hr'g Tr. 47.) Mr. Patel was not handcuffed. (Hr'g Tr. 50.) *See Brown*, 441 F.3d at 1349 (noting the suspect was not handcuffed and officers were not armed). During the car ride, the agents had a "simple, pleasant" conversation, and the agents never asked Mr. Patel whether he was here legally. (Hr'g Tr. 49.) Mr. Patel was told the purpose of the request – to determine whether he was legally in

---

[24] For determining whether a reasonable person felt free to leave, it would make no difference whether officers were actually unarmed or only appeared to be so.

the country – and he went to the office anyway.  (Hr'g Tr. 53-54.)  There is no testimony that the agents discouraged or prevented Mr. Patel from leaving or that he attempted to terminate the interview with Agent Diamond.[25]

Given these facts, this case resembles *United States v. Phillips*, in which the court found suspects were not in custody under similar circumstances.  812 F.2d 1355, 1362 (11th Cir. 1987).  In *Phillips*, one of the defendants, when asked, voluntarily accompanied an officer he knew well[26] to the station where the officer intended to take his statement.[27]  *Id.* at 1357.  The defendant was never under arrest, never handcuffed, and never locked in a space.  *Id.*  Although he was not informed that he was free to leave, one officer testified that the defendant could have left the station any time.  *Id.* at 1357.  The court reached this finding despite the defendant's testimony that he did not feel free to walk away.[28]  *Id.*  The defendant admitted that the officers did nothing to prevent him from leaving the station, and

---

[25] Indeed, an agent who took him testified that Mr. Patel was free to leave, and that if he had expressed a desire to leave, he would not have been restrained.  (Hr'g Tr. 54.)

[26] Ms. Patel knew at least one of the officers who executed the search from the inspections and minor compliance checks he conducted of Mr. Patel's business.  (Hr'g Tr. 10.)  The officer in *Phillips* was similarly assigned to pawn shop detail for the defendant's business for selling weapons, although admittedly, they saw each other every day.  812 F.2d at 1357.

[27] It was unresolved in *Phillips* whether the officers had driven the defendant to the station.  812 F.3d at 1357 n.2.

[28] "'[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *Yarborough*, 541 U.S. at 663 (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994) (*per curiam*)).  Courts must determine "'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *Id.* (quoting *Stansbury*, 511 U.S. at 322).

that he never requested a lawyer or tried to terminate the interview. *Id.* The other defendant agreed to come down to City Hall for an interview as well, and he was not arrested or restrained either. *Id.*

The court found that both defendants were not in custody and noted in its ruling that *Miranda* warnings are not required simply because questioning takes place in a police station, or because the person interviewed is considered a suspect. *Id.* at 1361. "'Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact the police officer is a part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'" *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1123 (1983), which held that a defendant who had voluntarily accompanied the police to the police station and was told he was not under arrest was not in custody during a police interview that was less than thirty minutes, *Phillips*, 812 F.2d at 1360 (summarizing the case)).

Based on the totality of the circumstances, Mr. Patel's interview was not a custodial interrogation, and his statements during that interview may be admitted. Mr. Patel agreed to voluntarily accompany an unarmed agent to the station. He was never handcuffed, told he was arrested, or shown weapons, and he never indicated he wanted to terminate the interview with Agent Diamond or that he wanted to leave. Because no other coercion was visited on him, he was not in custody for Fifth Amendment purposes. *See also United States*

21

*v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) (finding that an interview at the border was not custodial under similar circumstances).

To the extent it recommends suppressing Mr. Patel's statements to Agent Diamond, the Suppression Recommendation is due to be overruled.

As a final matter, the court notes that it is not inclined to grant any further continuances in this case on the basis that a ruling from the Immigration Judge remains pending.  Absent some other extraordinary circumstance, this case will remain on the April 12, 2010, trial docket.

## **CONCLUSION**

Accordingly, it is ORDERED that:

(1)    The Government's Objection with respect to the Motion to Suppress (Doc. # 60) is SUSTAINED;

(2)    The recommendation on the motion to suppress (Doc. # 52) is ADOPTED in part and OVERRULED in part.  It is ADOPTED as to all findings except the implicit recommendation that Mr. Patel's statements to the ICE Agent be suppressed, a finding that is OVERRULED.

(3)    The motion to suppress (Doc. # 25) is DENIED;

(4)    The recommendation on the motion to dismiss the indictment (Doc. # 53) is ADOPTED; and

22

(5)     The motion to dismiss the indictment (Doc. # 26) is DENIED.

DONE this 26th day of February, 2010.

                          /s/  W.  Keith Watkins
                     UNITED STATES DISTRICT JUDGE